## Philip CHARPENTIER

### v.

Mark GODSIL; James Sullivan; John Doe 1; John Doe 2; John Doe 3; John Doe 4; John Doe 5 (unknown corrections officers of the Monmouth County Correctional Facility); William M. Lanzaro (individually and in his official capacity as Monmouth County Sheriff); the City of Long Branch; Monmouth County Board of Chosen Freeholders (individually and in their official capacities); all Freeholders (as of February 22, 1985); Dr. Lewis (on call to the Monmouth County Correctional Facility); Nurse Roe; Dr. Roe and Psychiatrist Roe (of the Monmouth County Correctional Facility); Dr. Frank Niemtzow; Monmouth County Correctional Facility; Police Department of City of Long Branch; John Doe 6 (unknown employee of Long Branch Police Department, individually and in his official capacity).

Dr. Jacob Lewis, Appellant in 90–5656.

Philip Charpentier, Appellant in 90–5701.

Nos. 90–5656, 90–5701.

United States Court of Appeals, Third Circuit.

Argued Feb. 25, 1991.

Decided June 28, 1991.

Neil Mullin, Kevin Kiernan (argued), Smith, Mullin & Kiernan, West Orange, N.J., for Philip Charpentier.

Richard A. Amdur, P.C., John J. McDermott, III (argued), Oakhurst, N.J., for Jacob Lewis.

Before STAPLETON, ALITO and SEITZ, Circuit Judges.

## OPINION

ALITO, Circuit Judge:

Dr. Jacob Lewis, a physician employed by the Monmouth County Correctional Institution, appeals from a judgment awarding damages for malpractice under the New Jersey Tort Claims Act. Philip Charpentier, who won this judgment, cross-appeals. Because we hold that the district court misinterpreted the scope of Dr. Lewis's immunity under the New Jersey Tort Claims Act, we will reverse the judgment in favor of Charpentier. We reject the arguments raised in Charpentier's cross-appeal.

### I.

The following facts are not in dispute. Philip Charpentier has been diagnosed as suffering from a bipolar manic-depressive psychosis. In February 1985, while apparently in the throes of a manic episode, Charpentier was involved in an incident that resulted in his arrest by the Long Branch, New Jersey, Police Department. After detention for a few hours at police headquarters, Charpentier was transferred at approximately midnight to the Monmouth County Correctional Institution ("MCCI").

At the time of Charpentier's transfer to MCCI, Dr. Lewis was at home, and Charpentier was examined by Dorothy Loux, the nurse on duty. Observing Charpentier's agitated condition, Loux ordered that he be isolated in an observation cell under suicide watch and that he be stripped of all of his garments except his underwear.

During the ensuing hours, Charpentier's condition worsened. He began to cry hysterically, vomit, defecate uncontrollably, and beat the walls and doors of his cell. At approximately 5 a.m., Loux telephoned Dr. Lewis and apprised him of Charpentier's condition. Lewis did not go to MCCI, but instead prescribed an injection of Sparine, a tranquilizer. Loux followed Lewis's instructions and personally administered the injection. Despite the injection, Charpentier continued his frenzied activity. At about 8:30 a.m., two MCCI officers, Godsil and Sullivan, entered Charpentier's cell. A struggle ensued, and Charpentier sustained physical injuries. Charpentier subsequently filed this action in the United States District Court for the District of New Jersey, naming as defendants the City of Long Branch, the Long Branch Police Department, Officers Godsil and Sullivan, the Monmouth County Sheriff, MCCI, the Monmouth County Board of Chosen Freeholders, Dr. Lewis, Dr. Frank Niemtzow (another MCCI physician), and nine unknown defendants. As eventually amended, Charpentier's complaint contained seven counts, five of which named Dr. Lewis. Count I asserted claims against all the defendants under the Fourteenth Amendment. This count alleged that Dr. Lewis "made no meaningful diagnosis" and "provided no meaningful treatment" for Charpentier and that Dr. Lewis provided consultation regarding the Sparine injection. This count asserted that Dr. Lewis "acted in reckless disregard" of Charpentier's constitutional

rights. Count II asserted claims against Godsil, Sullivan, and unknown MCCI officers for assault and battery. Count III claimed that Dr. Lewis and other defendants violated the "standards governing the care of prisoners in the State of New Jersey." Count IV apparently asserted claims against Dr. Lewis and others under the New Jersey Tort Claims Act. This count incorporated all of the previous counts, but did not otherwise specify the factual basis for the claim against Dr. Lewis. Count V claimed that Dr. Lewis and other defendants committed malpractice by "[fail]ing to provide ... proper medical care and diagnosis, although [Charpentier] was in obvious, severe medical and psychiatric distress." This count did not mention the New Jersey Tort Claims Act or specify any other legal basis for the claim. Count VI asserted claims under the New Jersey Tort Claims Act against MCCI and the Board of Chosen Freeholders based on the doctrine of *respondeat superior*. Finally, Count VII asserted claims against Dr. Lewis and others for failure to supervise the MCCI correctional staff to ensure that acts of violence were not committed against prisoners. The legal basis for this claim was not specified.

Before trial, most of Charpentier's claims were eliminated either by settlement or summary judgment. Dr. Lewis was left as the sole remaining defendant, and the only remaining claims against him were based on the New Jersey Tort Claims Act. Those claims were (1) that Dr. Lewis was responsible for a negligent policy at MCCI regarding the treatment of the mentally ill; (2) that Dr. Lewis committed an assault and battery upon Charpentier by prescribing the administration of an injection without consent; and (3) that Dr. Lewis committed malpractice in his treatment of Charpentier. Charpentier's request for damages was also narrowed before trial. The court ruled that Dr. Lewis's alleged conduct was not the proximate cause of the physical injuries allegedly inflicted by the guards and that punitive damages were not avail-

able under the New Jersey Tort Claims Act by virtue of N.J.S.A. 59:2–10.

At trial, Charpentier's medical expert, Dr. Donald F. Klein, testified that Dr. Lewis deviated from the standard of care in the medical profession by prescribing treatment without making a personal examination and diagnosis. Dr. Klein declined to state that the Sparine injection caused any harm, but Dr. Klein did testify that confining a person in the midst of a psychotic episode in an isolation cell would exacerbate his condition. Dr. Klein suggested that a personal examination and diagnosis of Charpentier would have shown that transfer to a psychiatric or medical facility was advisable. Dr. Klein testified that Charpentier's immediate condition might have been alleviated simply by the atmosphere in such a facility and that transfer to such a facility might have led to a better diagnosis or treatment with drugs. Charpentier also testified himself and described in detail the mental and emotional pain he suffered while confined in MCCI.

At the close of the trial, the district court dismissed Charpentier's claim that Dr. Lewis was responsible for the existence of a negligent policy at MCCI. In addition, the court specified that the period for which damages might be recovered was between 5:30 a.m. (when Dr. Lewis was called) and 8:30 a.m. (when Charpentier suffered the physical injuries). The jury returned a verdict for Charpentier on his malpractice claim and awarded $50,000 in damages for "mental and emotional pain and suffering." The jury, however, returned a verdict for Dr. Lewis on the assault and battery claim.

Dr. Lewis then moved for a judgment notwithstanding the verdict (Fed.R.Civ.P. 50(b)) or, in the alternative, alteration or amendment of the judgment (Fed.R.Civ.P. 59(e)), claiming that he was immune from liability under N.J.S.A. 59:6–5 and 6–6.[1] In response, Charpentier argued that Dr. Lewis was barred from raising the issue of immunity because he had failed to plead this affirmative defense in his answer, as required by Fed.R.Civ.P. 8(c).

---

1. N.J.S.A. 59:6–5 and 6–6 are set out on page 864, *infra.*

The district court declined to address Charpentier's argument under Fed.R.Civ.P. 8(c) but instead rejected Dr. Lewis's immunity defense on the merits. The court held that Dr. Lewis was not immune under N.J.S.A. 59:6–5 because he had undertaken to treat Charpentier and had not simply failed to make a diagnosis. The district court likewise held that Dr. Lewis was not immune under N.J.S.A. 59:6–6 because Charpentier's malpractice claim was not based on Dr. Lewis's failure to arrange for involuntary commitment or other confinement pursuant to statute, but was instead based on Dr. Lewis's failure "to provide adequate medical care by leaving [Charpentier] in an isolation cell without psychiatric treatment."

Dr. Lewis has appealed, contending among other things that the district court erred in denying his claim of immunity. Charpentier has cross-appealed and raises issues concerning his claim of assault and battery and the district court's ruling that Dr. Lewis's conduct was not the proximate cause of the physical injuries allegedly inflicted by the guards. We turn first to Dr. Lewis's arguments concerning immunity.

## II.

Before addressing the merits of Dr. Lewis's contentions regarding immunity, we must first consider Charpentier's argument that immunity under the New Jersey Tort Claims Act was an affirmative defense that Dr. Lewis was required to plead in his answer under Fed.R.Civ.P. 8(c).

 Under federal law, the sovereign immunity of the federal government may not be waived by the failure to plead. *United States v. United States Fidelity Company*, 309 U.S. 506, 513, 60 S.Ct. 653, 656, 84 L.Ed. 894 (1940). Under New Jersey law, however, immunity under the State Tort Claims Act is regarded as an affirmative defense that must be pled by the public entity or employee. *Kolitch v. Lindedahl*, 100 N.J. 485, 497, 497 A.2d 183, 189 (1985); *Ciambrone v. State Department of Transportation*, 233 N.J.Super. 101, 105, 558 A.2d 47, 49 (App.Div.), *certif. denied*, 117 N.J. 664, 569 A.2d 1356 (1989). *See also* New Jersey Court Rule 4:5–4. Matters treated as affirmative defenses under state law are generally treated in the same way by federal courts in diversity cases. *Troxler v. Owens–Illinois, Inc.*, 717 F.2d 530, 532 (11th Cir.1983); *Bartak v. Bell–Galyardt & Wells, Inc.*, 629 F.2d 523, 527 (8th Cir.1980); 5 C. Wright and A. Miller, *Federal Practice and Procedure* § 1272 at 448 (1990). Accordingly, we will treat Dr. Lewis's assertion of immunity under provisions of the New Jersey Tort Claims Act as an affirmative defense covered by Fed.R.Civ.P. 8(c).

 Failure to raise an affirmative defense by responsive pleading [2] or by appropriate motion [3] generally results in the waiver of that defense. In the present case, although the answers filed by many of the other defendants asserted the affirmative defense of immunity under the New Jersey Tort Claims Act, Dr. Lewis's answer neglected to do so. Instead, the first and the only occasion before trial when Dr. Lewis may have asserted that defense was when he joined the trial brief submitted by MCCI.[4] A trial brief, however, is not an appropriate vehicle for raising an affirmative defense covered by Rule 8(c).

 Failure to raise an affirmative defense by responsive pleading or appropriate motion, however, does not always result in waiver. *See Prinz v. Greate Bay Casino Corp.*, 705 F.2d 692, 694 (3d Cir.1983). Under Fed.R.Civ.P. 15(a), a responsive plead-

---

**2.** *E.E.O.C. v. United States Steel Corporation*, 921 F.2d 489, 491–92 n. 2 (3d Cir.1990); *Prinz v. Greate Bay Casino, Corp.*, 705 F.2d 692, 694 (3d Cir.1983).

**3.** *See, e.g., Williams v. Murdoch*, 330 F.2d 745, 749 (3d Cir.1964); *Hartmann v. Time, Inc.*, 166 F.2d 127, 131 n. 3 (3d Cir.1947).

**4.** Dr. Lewis contends that he raised the defense of immunity by joining MCCI's summary judgment motion. The immunity claim asserted in that motion, however, is entirely different from that asserted by Dr. Lewis in his post-trial motion and on appeal. Thus, we do not regard that motion as having adequately raised the defense.

ing may be amended at any time by leave of court to include an affirmative defense, and "leave shall be freely given when justice so requires." *See Smallwood v. United Airlines, Inc.*, 661 F.2d 303, 306 (4th Cir.1981), *cert. denied*, 456 U.S. 1007, 102 S.Ct. 2299, 73 L.Ed.2d 1302 (1982), 469 U.S. 832, 105 S.Ct. 120, 83 L.Ed.2d 62 (1984); *Wyshak v. City National Bank*, 607 F.2d 824, 826 (9th Cir.1979). Unless the opposing party will be prejudiced, leave to amend should generally be allowed. *See Howze v. Jones & Laughlin Steel Corp.*, 750 F.2d 1208, 1212 (3d Cir.1984). Moreover, under Fed.R.Civ.P. 15(c), issues tried by the express or implied consent of the parties are "treated in all respects as if they had been raised in the pleadings." *See Prinz v. Greate Bay Casino Corp.*, 705 F.2d at 694. It has been held that a "defendant does not waive an affirmative defense if '[h]e raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.'" *Lucas v. United States*, 807 F.2d 414, 418 (5th Cir.1986), quoting *Allied Chemical Corp. v. MacKay*, 695 F.2d 854, 855–56 (5th Cir.1983).

In the present case, it would be inappropriate for us to hold that Dr. Lewis's immunity defense was waived. The answers of the other defendants and MCCI's trial brief should have alerted, and undoubtedly did alert, Charpentier to the issue of immunity under the New Jersey Tort Claims Act. Charpentier has not claimed that his case was prejudiced in any way by Dr. Lewis's failure to plead this defense; and the immunity issue presented in this case, as explained below, involves no factual issues. Consequently, we believe that the district court possessed discretion to permit an amendment of the answer to assert this defense even after the verdict was returned. The district court, however, did not rule on the question of whether Dr. Lewis's asserted immunity had been waived, but instead rejected the immunity claim on the merits. Because we cannot determine whether the district court would have permitted a curative amendment of the answer if the court had not rejected the immunity claim on the merits, it would be inappropriate for us to reject Dr. Lewis's immunity claim on procedural grounds. Accordingly, we will examine the merits of the immunity claim.

### III.

Dr. Lewis relies on two provisions of the New Jersey Tort Claims Act. The first, N.J.S.A. 59:6–5, provides as follows:

a. Neither a public entity nor a public employee is liable for injury resulting from diagnosing or failing to diagnose that a person is afflicted with mental illness or is a drug dependent person or from failing to prescribe for mental illness or drug dependence; provided, however, that nothing in this subsection exonerates a public entity or a public employee who has undertaken to prescribe for mental illness or drug dependence from liability for injury proximately caused by his negligence or by his wrongful act in so prescribing.

b. Nothing in subsection a. exonerates a public entity or a public employee from liability for injury proximately caused by a negligent or wrongful act or omission in administering any treatment prescribed for mental illness or drug dependence.

The second provision, N.J.S.A. 59:6–6, states:

a. Neither a public entity nor a public employee is liable for any injury resulting from determining in accordance with any applicable enactment:

(1) whether to confine a person for mental illness or drug dependence;

(2) the terms and conditions of confinement for mental illness or drug dependence;

(3) whether to parole, grant a leave of absence to, or release a person from confinement for mental illness or drug dependence.

The term "mental illness," which appears in both provisions, is defined by N.J.S.A. 59:6–1 to mean specified mental conditions. That provision states:

"Mental illness" means mental illness, mental disorder bordering on mental illness, mental deficiency, epilepsy, dipso-

mania or inebriety, sexual psychopathy, or such mental abnormality as to evidence utter lack of power to control sexual impulses.

In applying these immunity provisions to the present case, we are confronted with different questions in relation to two categories of injury: first, any injury resulting from Dr. Lewis's direction that Charpentier be injected with Sparine and second, any injury resulting from his failure to prescribe any other treatment. We will address each category of injury separately.

A. *Sparine injection.* It is clear that N.J.S.A. 59:6–5 provides no immunity for injury resulting from the allegedly wrongful injection of Sparine. The statute expressly confers immunity only for injury resulting from "diagnosing," "failing to diagnose," or "failing to prescribe for mental illness"; the statute makes no reference to immunity for treatment that is actually prescribed or administered.

■ Despite the absence of any reference to immunity for treatment, it could be argued that the immunity provided for injury resulting from an incorrect diagnosis applies to injury resulting from treatment prescribed or administered pursuant to that diagnosis.[5] This argument, however, is squarely contrary to the proviso of N.J.S.A. 59:6–5(a). This proviso clearly states that when a public entity or employee makes a diagnosis of mental illness and undertakes to prescribe for that condition, no immunity is conferred "for injury proximately caused by ... negligence or by [a] wrongful act in so prescribing." Thus, the proviso leaves no doubt that the allegedly wrongful injection of Sparine is not immunized.

It is also clear that N.J.S.A. 59:6–6 has no application to the Sparine injection. This provision deals solely with any injury resulting from determining whether to confine or release a person or from the terms or conditions of confinement.

B. *Failure to prescribe.* Dr. Lewis's claim for immunity raises more substantial questions with respect to any injury resulting from his failure to prescribe other treatment for Charpentier's mental problems. We predict, however, that the New Jersey Supreme Court would hold that N.J.S.A. 59:6–5 provides immunity for any injury resulting from the failure to prescribe for mental illness, even when, as in this case, some treatment is prescribed. We reach this conclusion because any such injury appears to fall squarely within the language in N.J.S.A. 59:6–5(a) that confers immunity "for injury resulting ... from failing to prescribe for mental illness," and neither the proviso in subsection a. nor subsection b. appears to narrow this grant of immunity.

■ 1. *The proviso in subsection a.* The proviso, as previously noted, states that no immunity is conferred "for injury proximately caused by negligence or [a] wrongful act in ... *prescribing* [for mental illness]." N.J.S.A. 59:6–5(a) (emphasis added). In order for the present case to fit within this language, we would have to hold that the term "prescribing" embraces, not only what Dr. Lewis did (prescribing the Sparine injection), but also what he failed to do (prescribing the other treatment recommended by Charpentier's expert—i.e., transfer to a medical or psychiatric facility). We reject this interpretation for at least four reasons.

First, the rule of construction adopted by the New Jersey courts militates against this constricted interpretation of the immunity provided by N.J.S.A. 59:6–5. The New Jersey courts have concluded that close questions of interpretation relating to these immunity provisions must be resolved in favor of immunity. *Kyriakos v. Dept. of Human Services,* 216 N.J.Super. 308, 312, 523 A.2d 692, 693 (App.Div.1987), *certif. denied,* 108 N.J. 182, 528 A.2d 12 (1987); *Predoti v. Bergen Pines Cty. Hospital,* 190 N.J.Super. 344, 347, 463 A.2d 400, 402–03 (App.Div.1983).

**5.** Even if this construction were correct, it would not help Dr. Lewis. Dr. Lewis maintains that he never made a diagnosis of mental illness and consequently cannot rely upon the immunity for injury resulting from such a diagnosis.

Second, such an interpretation of the term "prescribing" would be inconsistent with the careful distinctions drawn in N.J.S.A. 59:6–5(a) between acts and omissions. This provision refers to "diagnosing or failing to diagnose," as well as "undertak[ing] to prescribe" and "failing to prescribe." It would not be consistent with this pattern of usage to interpret a term denoting an affirmative act ("prescribing") as including the omission of that act (the failure to prescribe). The Legislature employed the term "failing to prescribe" in the portion of N.J.S.A. 59:6–5(a) that precedes the proviso. If the Legislature had wanted to refer in the proviso to the concept of "failing to prescribe," the Legislature almost certainly would have employed the same or similar terminology.

Third, if the term "prescribing" in the proviso applied to the failure to prescribe, N.J.S.A. 59:6–5(a) would produce inconsistent results that we do not believe the Legislature intended. Under this interpretation, although a public entity or employee would generally remain immune for injury caused by failing to prescribe for mental illness, an entity or employee who "under[took] to prescribe for mental illness" would not be immune for injury caused by the failure to prescribe additional treatment. The ramifications of this interpretation can be illustrated by supposing that three publicly employed physicians examined three patients needing identical treatment for mental illness. If the first physician, although fully aware of his patient's need for treatment, did not prescribe any treatment whatsoever, this physician, despite his dereliction, would clearly be immune under N.J.S.A. 59:6–5(a). Because this physician did not undertake to prescribe any treatment, the proviso would not apply and thus would not take away his immunity for "failing to prescribe" for mental illness. Similarly, if the second physician prescribed treatment intended to ameliorate a condition other than "mental illness" (e.g., a condition that the physician regarded as a lesser mental problem),[6] this physician would also be immune under N.J.

S.A. 59:6–5(a). Because this physician did not undertake to prescribe for "mental illness," the proviso would not apply and consequently would not take away his immunity for "failing to prescribe" for mental illness. On the other hand, if the third physician undertook to prescribe for mental illness, prescribed some beneficial treatment, but failed to prescribe other necessary treatment, this physician, although seemingly the least culpable of the three, would not be immune. Because he undertook to prescribe for mental illness, the proviso would apply in his case and would remove his immunity for injury resulting from the failure to prescribe other treatment for the patient's mental illness.

We do not believe that N.J.S.A. 59:6–5(a) was meant to produce such discordant results. It seems unlikely that the Legislature intended to confer immunity in the first two cases but not the third. It also seems unlikely that the Legislature intended for immunity to depend upon whether prescribed treatment was intended to alleviate "mental illness" as defined by N.J.S.A. 59:6–1 or a lesser mental condition. It is difficult to see why the Legislature would have wanted immunity to depend upon such a fine and often elusive distinction regarding subjective intent.

These inconsistent and unfortunate consequences are avoided if the term "prescribing" in the proviso is interpreted, as we believe was intended, to refer only to the affirmative act of prescribing and not the failure to prescribe. Under this natural interpretation, N.J.S.A. 59:6–5(a) provides immunity in all circumstances for injury resulting from the failure to prescribe, and likewise provides no immunity in any circumstances for injury resulting from the affirmative act of prescribing. This interpretation implements the Legislature's apparent view that public entities and employees should not be liable for failing to prescribe for mental illness, due to "the difficulties involved when attempting to diagnose mental illness .. and when attempting to decide whether or not to prescribe for such conditions" (N.J.S.A. 59:6–5, com-

6. See N.J.S.A. 59:6–1, supra, pages 864–65.

ment), but that a physician should be liable if his affirmative acts cause harm.

■ Finally, this interpretation is bolstered by N.J.S.A. 59–6–6, under which, as previously noted, a public entity or employee is immune for any injury "resulting from determining in accordance with any applicable enactment ... the terms and conditions of confinement for mental illness." While we agree with the district court that this provision is not directly applicable to the present case because Charpentier was detained in MCCI on criminal charges and not confined for mental illness, we believe that N.J.S.A. 59:6–6 sheds light on the meaning of N.J.S.A. 59:6–5. Under N.J.S.A. 59:6–6, if Dr. Lewis had determined to confine Charpentier for mental illness and had placed him under the identical terms and conditions of confinement as existed in the MCCI isolation cell, Dr. Lewis would be immune. It therefore seems unlikely that the Legislature intended to make a physician like Dr. Lewis liable for placing a detainee on criminal charges under precisely the same terms and conditions of confinement.[7]

2. *Subsection b.* We predict that the New Jersey Supreme Court would hold that subsection b., like the proviso to subsection a., does not withdraw immunity for injury resulting from the failure to prescribe for mental illness. Subsection b. specifies that a public entity or employee is not immune "for injury proximately caused by a negligent or wrongful act or omission in *administering* any treatment prescribed for mental illness" (emphasis added). This provision plainly applies only to the "administering" of treatment, not the "prescribing" of treatment (which is covered by the proviso in subsection a.) and certainly not the failure to prescribe.

In sum, we conclude that N.J.S.A. 59:6–5 provides immunity for any injury caused by Dr. Lewis's failure to prescribe. The record makes clear, however, that all of the

injury suffered by Charpentier during the hours in question resulted from his failure to receive treatment for mental illness. At trial, Charpentier testified in graphic detail regarding the pain and suffering he endured as the result of his confinement without treatment, but neither Charpentier nor his medical expert testified that Charpentier suffered any harm as a result of the Sparine injection. Consequently, the award of $50,000 in damages must be reversed.

IV.

■ A. We turn now to the issues raised by Charpentier in his cross-appeal. Charpentier contends, first, that the district court erred in instructing the jury that an act that would otherwise constitute a battery in the absence of consent may sometimes be justified in emergency circumstances. We hold that the district court did not err in giving this instruction.

Contrary to Charpentier's argument, this instruction was not barred by Fed.R.Civ.P. 8(c). We need not decide whether this instruction related to an affirmative defense covered by Rule 8(c) because it is clear that Dr. Lewis's failure to assert the existence of an emergency in his answer was not fatal. Charpentier's complaint contains no express assertion that Dr. Lewis committed an assault or battery. Count II of the amended complaint, which asserted assault and battery claims against Godsil, Sullivan, and unknown MCCI officers, made no mention of Dr. Lewis. On the other hand, the counts of the complaint naming Dr. Lewis as a defendant made no mention of assault or battery. Having failed to assert an express assault and battery claim against Dr. Lewis in his complaint, Charpentier can hardly maintain that Dr. Lewis waived a defense relating exclusively to such a claim by failing to plead that defense in his answer. Thus, it is apparent that both Char-

---

7. We also note that the New Jersey Tort Claims Act generally prohibits recovery for pain and suffering. N.J.S.A. 59:9–2(d). Injury resulting from the failure to prescribe for mental illness will very often fall into this category. (In the case at hand, all of the damages awarded by the jury were for "mental and emotional pain and suffering."). Thus, N.J.S.A. 59:9–2(d) alone would preclude many plaintiffs from recovering for the failure of a public entity or employee to prescribe for mental illness.

pentier's assault and battery claim and Dr. Lewis's emergency defense were tried by mutual implied consent. *See* Fed.R.Civ.P. 15(b). Indeed, Charpentier's attorney introduced evidence on the very question of emergency during his case-in-chief. After calling Dr. Lewis as a witness for the plaintiff, Charpentier's attorney elicited the following colloquy:

Q. Well, you characterized the condition Mr. Charpentier was in as constituting an emergency, didn't you before?

A. That's right.

Q. And it was an emergency, was it not?

A. That's right. That's right. March 14, 1990, Transcript at 83.

B. We likewise reject Charpentier's argument that the evidence at trial was insufficient to permit the jury to determine whether an emergency existed. The district court instructed the jury that an emergency exists if the following three conditions are satisfied:

1. The patient must be unconscious or without capacity to make a decision while no one legally authorized to act as agent for the patient is available.

2. Time must be of the essence in the sense that it must reasonably appear that delay until such time as an effective consent could be obtained would subject the patient to a risk of serious bodily injury or death which prompt action would avoid.

3. Under the circumstances a reasonable person would consent and the probabilities are that the patient would consent.

Here, the evidence relating to these conditions was not insufficient as a matter of law. As noted above, Charpentier's attorney himself elicited testimony that an emergency existed. In light of the testimony regarding Charpentier's acute psychotic condition and extreme behavior, a jury could rationally conclude that all of the conditions necessary for an emergency existed.

8. Moreover, Charpentier's contention cannot stand in light of our conclusion that Dr. Lewis is immune under the New Jersey Tort Claims Act

C. Finally, Charpentier argues that the district court erred in ruling that Dr. Lewis's conduct was not a proximate cause of the physical injuries allegedly inflicted by the guards. This contention clearly lacks merit. A tort-feasor is not responsible for injury resulting from an intervening cause that is not reasonably foreseeable. *Rappaport v. Nichols*, 31 N.J. 188, 203–204, 156 A.2d 1, 8 (1959); *Bandel v. Friedrich*, 235 N.J.Super. 384, 390, 562 A.2d 813, 816 (App.Div.1989), *aff'd*, 122 N.J. 235, 584 A.2d 800 (1991). Here, there was simply no evidence that Dr. Lewis could have reasonably foreseen that Charpentier would be assaulted if left in the isolation cell.[8]

## V.

In sum, we will reverse the judgment in favor of Charpentier and remand for entry of a judgment in favor of Dr. Lewis.

for any injury other than that caused by the Sparine injection.