

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-27-2003

# Oelsner v. USA

Precedential or Non-Precedential: Non-Precedential

Docket 00-3720

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"Oelsner v. USA" (2003). *2003 Decisions.* Paper 711.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/711

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

NOT PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

Nos. 00-3720 & 00-3721

W. JAMES OELSNER

v.

UNITED STATES OF AMERICA

W. James Oelsner, *West Indies Transport and WIT Equipment Co.,

Appellants

(*Pursuant to Rule 12(a), F.R.A.P.)

On Appeal from the District Court of the Virgin Islands
Division of St. Croix
D.C. Civil Action No. 98-cv-00244
(Honorable Raymond L. Finch)

Argued November 13, 2002

Before:  SCIRICA, ALITO and RENDELL, <u>Circuit</u> <u>Judges</u>

(Filed: March 27, 2003)

PETER GOLDBERGER, ESQUIRE (ARGUED)
Law Office of Peter Goldberger
50 Rittenhouse Place
Ardmore, Pennsylvania 19003-2276

    Attorney for Appellants

DAVID R. LEWIS, ESQUIRE (ARGUED)
DAVID M. NISSMAN, ESQUIRE
ERNEST F. BATENGA, ESQUIRE
Office of United States Attorney
1108 King Street, Suite 201
Christiansted, St. Croix
U.S. Virgin Islands 00820

       Attorney for Appellee

---

## OPINION OF THE COURT

---

SCIRICA, *Circuit Judge*.

This is a 28 U.S.C. § 2255 action by defendants, a chief executive officer and his company, who were convicted of violating federal laws. Defendant W. James Oelsner already has served his prison term but seeks reversal to avoid the consequences of his multi-million dollar fine and restitution. For reasons that follow, we will affirm.

**I.**

Defendants West Indies Transport, Inc., WIT Equipment Co., and their former chief executive officer, W. James Oelsner, were convicted of violating environmental, tax, and immigration laws in connection with their recruitment and hiring of Filipino workers to repair barges damaged by Hurricane Hugo in St. Thomas, Virgin Islands. The District Court sentenced Oelsner to 37 months incarceration and ordered defendants to pay fines in excess of $4 million and restitution in excess of $1 million. In 1997, on direct appeal, we

affirmed the conviction and sentence. *United States v. West Indies Transp., Inc.*, 127 F.3d 299 (3d Cir. 1997).

## II.

Defendants present five distinct claims in their § 2255 motion. Because these are new claims, not raised at trial or on direct appeal, we must determine whether they are procedurally barred.

## A.

Section 2255 provides a remedy where it appears that "a defendant stands convicted of an act that the law does not make criminal." *Bousley v. United States*, 523 U.S. 614, 620 (1998) (internal quotations and citations omitted). Here, defendants contend one of the government theories charged in the visa fraud counts meets that standard. Specifically, they argue the indictment and jury instructions wrongly interpreted the statutory boundaries of a D-1 visa and thus failed to state an offense.

Procedural default bars a defendant from raising new claims in his § 2255 motion. Defendants here contend their visa fraud claim, not raised at trial or on direct appeal, is not procedurally barred because the government failed to raise procedural default as an affirmative defense to their § 2255 motion.[1]

---

[1]Even if the government raised its affirmative defense of procedural default before the District Court, defendants urge us to consider ineffective assistance of counsel as the cause for that default.

3

The Supreme Court has determined that "procedural default is an affirmative defense for" the government. *Gray v. Netherland*, 518 U.S. 152, 165-66 (1996).[2]  Where the government fails to raise an affirmative defense in a timely manner, it "lose[s] the right to assert the defense thereafter." *Id.* at 166.

Under Rule 8(c) of the Federal Rules of Civil Procedure, a litigant should assert an affirmative defense in the appropriate responsive pleading or risk waiving its right to assert the defense. *Eddy v. V.I. Water & Power Auth.*, 256 F.3d 204, 209 (3d Cir. 2001).  But we have adopted a more flexible approach in defining the Supreme Court's "timely manner" requirement.  In *Charpentier v. Godsil*, 937 F.2d 859 (3d Cir. 1991), we stated:

> Under Fed. R. Civ. P. 15(a), a responsive pleading may be amended at any time by leave of court to include an affirmative defense, and leave shall be freely given when justice so requires.  Unless the opposing party will be prejudiced, leave to amend should generally be allowed. . . .  It has been held that a defendant does not waive an affirmative defense if he raised the issue at a pragmatically sufficient time, and [the plaintiff] was not prejudiced in its ability to respond.

*Id.* at 863-64 (internal quotations and citations omitted).

Here, defendants filed their original § 2255 motion pro se, stating "[t]he evidence at trial failed to prove that Movants violated any crimes.  The evidence actually showed that

---

[2]Other courts of appeals have raised issues of procedural bar sua sponte.  *E.g.*, *Rosario v. United States*, 164 F.3d 729, 732 (2d Cir. 1998); *United States v. Talk*, 158 F.3d 1064, 1067 (10th Cir. 1998).  They have done so out of concern for judicial efficiency and to protect the finality of federal criminal judgments.  *Rosario*, 164 F.3d at 732.  But the Supreme Court has stated clearly that an appellate court is not "required" to raise the affirmative defense of procedural default sua sponte.  *Trest v. Cain*, 522 U.S. 87, 89 (1997).

4

Movants did not commit any crimes." The government, in its responsive pleading, interpreted this claim as one of new evidence. Prior to the § 2255 hearing, the District Court appointed Benson B. Weintraub as counsel to Oelsner. Weintraub, in his brief to the District Court, explained the visa fraud claim as "a claim that the indictment failed to state an offense [sic] against the United States" that proves "why defendants' conduct does *not* constitute a violation of the statutes and laws of the United States and the Virgin Islands." He drew attention to the government's and District Court's "erroneous" characterization of the visa fraud claim as one of new evidence: "[d]efense counsel is in receipt of the Court's [Pre-Hearing] Order dated May 22, 2000 and respectfully seeks modification of its terms to the extent that the defendant's pro se Eighth Amendment and actual innocence claims should be denominated as a claim that the indictment fails to state an offense against the United States and Virgin Islands."

The government contends it sufficiently raised the affirmative defense of procedural default in its initial response to defendants' § 2255 motion. The relevant portion of the government's response reads: "Petitioner seeks to litigate issues that could have been raised on direct appeal (in fact, many, but not all, of these issues were raised and litigated at the trial court level). Petitioner is barred from raising them in this forum by the doctrine of procedural default."

Even if this "affirmative defense" is not specific to Oelsner's particular claim here, the government contends Oelsner's visa fraud claim asserted on appeal bears little resemblance to the one raised in the pro se § 2255 motion. The government argued to the

5

District Court that "[t]he issue of [Oelsner's] innocence has already been litigated and these claims serve only to relitigate issues that have already been raised. [Oelsner] is thereby barred from raising these issues now." Believing the issue had been litigated, the government elected not to raise the affirmative defense of procedural default for this specific claim.

Although this matter is not free from doubt, we believe Oelsner raised a "failure to state an offense" claim in his pro se § 2255 motion. Therefore, this claim, which has not changed appreciably since its inception in the pro se § 2255 motion, was framed sufficiently for the government to respond with an affirmative defense of procedural default. The government failed to properly do so.

Where the government asserts an affirmative defense of procedural default, it bears the burden of proof. *See Bennett v. Mueller*, 296 F.3d 752, 762 (9th Cir. 2002) ("[T]here is good reason to place the burden of proving adequacy on the state, the most obvious of which is that procedural default is an affirmative defense."); *Hooks v. Ward*, 184 F.3d 1206, 1216-17 (10th Cir. 1999) ("[T]he state is undoubtedly in a better position to establish the regularity, consistency, and efficiency with which it has applied [its procedural bar] than are habeas petitioners, who often appear pro se, to prove the converse."). Under the facts here, we do not believe the government's general statement was sufficiently specific to raise an affirmative defense to warrant forfeiture of defendants' visa fraud claim. *See Boykins v. Wainwright*, 737 F.2d 1539, 1545 & n.3 (11th Cir. 1984) (rejecting

6

affirmative defense where government's assertion did not identify the specific claim).[3] We

will consider the merits of Oelsner's claim.

**B.**

On direct appeal, we affirmed defendants' convictions for aiding and abetting visa

fraud based on Oelsner's securing D-1 visas for the company's Filipino workers. *West*

*Indies Transp.,* 127 F.3d at 304. As we stated, D-1 visas are intended for non-immigrant

foreign maritime crewmen. *Id*. Federal law permits granting a D-1 visa to "an alien

crewman serving in good faith . . . in a capacity required for normal operation and service

on board a vessel, as defined in [8 U.S.C. § 1288(a)]." 8 U.S.C. § 1101(a). The statute

expressly defines the key phrase "normal operation and service on board a vessel" to

exclude longshore work (loading or unloading of cargo, handling of mooring lines on the

dock), but is silent with respect to drydock or any other type of work. 8 U.S.C. § 1288(a).

In their § 2255 motion, defendants allege the indictment and jury instructions

improperly included a drydock theory of culpability. They contend the government's expert

witness, Jeffrey Gorsky, who testified as to a D-1 visa's restrictions, impermissibly relied

on a State Department advisory opinion. They argue the District Court then erred by

incorporating Gorsky's erroneous interpretation in its jury instructions. They contend that

---

[3]At least one appellate court has looked to a district court's decision and assumed a waiver of the affirmative defense where the district court ruled based on the substantive merits of the petition. *Pennington v. Spears*, 779 F.2d 1505, 1506 (11th Cir. 1986). Here, the District Court elected to decide the visa fraud claim on substantive, rather than procedural, grounds.

no statute or regulation prohibits drydock work for a foreign worker on a D-1 visa. Because drydock work by aliens is not statutorily prohibited, defendants argue the indictment and jury instructions failed to state a valid offense and therefore their conviction rested on an erroneous interpretation of law.

Counts 12-19 of the indictment charged that the alien crewmen engaged in activities "not required for the normal operation and services of a seagoing vessel, including but not limited to activities such as drydocking and longshoreman work." In its jury instructions, the District Court said: "I instruct you that in order to qualify for [a] crewman's visa, the crewman's work must be restricted to that which is necessary for the normal operation and service of a vessel."

The jury instructions also cited to State Department regulations "specify[ing] that crewman's [sic] visas are not to be issued for the purpose of having alien workers come to the United States to perform drydocking or other work not associated with the normal operation and service of a vessel." Defendants contend the reference to drydock work in the indictment and jury instructions constitutes legal error.[4]

_____

[4]In *Griffin v. United States*, 502 U.S. 46, 59 (1991), the Supreme Court noted the distinction between legal error, which requires vacation of a verdict, and insufficiency of proof, which does not. Where an indictment or set of jury instructions contain legal error, the Supreme Court has stated the following rule:

> Jurors are not generally equipped to determine whether a particular theory of conviction submitted to them is contrary to law – whether, for example, the action in question is protected by the Constitution, is time barred, or fails to come within the statutory definition of the crime. When, therefore, jurors

(continued...)

8

We believe defendants' interpretation of legal error is overly narrow. In this case, the focus of the indictment and jury instructions is on the phrase "normal operation and service on board a vessel." The statutory language defines those eligible for a D-1, or crewman's, visa as:

> an alien crewman serving in good faith as such in a capacity required for normal operation and service on board a vessel . . . or aircraft, who intends to land temporarily and solely in pursuit of his calling as a crewman and to depart from the United States with the vessel or aircraft on which he arrived or some other vessel or aircraft.

8 U.S.C. § 1101(15)(D)(i).

The common thread in the statutory language, superseding indictment, and jury instructions is the reference to work restricted to "normal operation and service on board a vessel." The indictment alleged – and the evidence at trial amply demonstrated – that the Filipino workers for whom Oelsner secured D-1 visas did not work in "normal operation and service on board a vessel." On the contrary, the evidence demonstrated that the Filipino workers performed road work, worked on land on containers that were used to house employees' automobiles, moved cargo, drove to the post office to receive parts, performed carpentry work on land, did mechanical work and servicing on vehicles, and performed maintenance work on shore. *See West Indies Transp.*, 127 F.3d at 303-04. They were

---

[4](...continued)
> have been left the option of relying upon a legally inadequate theory, there is no reason to think that their own intelligence and expertise will save them from that error.

*Id*.

9

never put to sea and they demonstrated no intent, as required by the statute, "to depart from the United States with the vessel." 8 U.S.C. § 1101(15)(D)(i). This work was not within the "normal operation and service of a vessel."

On direct appeal, we determined "defendants' intention [was] to employ as dock workers illegally underpaid foreign workers housed permanently on derelict barges." *West Indies Transp.*, 127 F.3d at 306. We concluded the vessel "was used to house foreign workers, not as a means of transport." *Id.* at 309. Defendants paid the Filipino workers approximately $400 per month for a 56-hour work week. *Id.* at 304. As we stated, "had immigration officials known the true facts behind the Filipino workers' applications for visas . . . the visas would never have been granted." *Id.* at 306. The evidence also demonstrated that defendants obtained visas in excess of the number of employees needed to crew the vessel.

As noted, the indictment here cited to activities of the alien crewmen that were "not required for the normal operation and services of a seagoing vessel." The relevant jury instructions charged "that in order to qualify for [a] crewman's visa, the crewman's work must be restricted to that which is necessary for the normal operation and service of a vessel." While both the indictment and jury instructions made reference to drydock work, they clearly defined the offense as work not within "the normal operation and service of a vessel." There was ample evidence the alien crewmen here engaged in work not within the normal operation and service of a vessel. That is the relevant inquiry. The references to drydock work were neither improperly confusing nor misleading, and they did not make the

indictment and instructions legally invalid. At worst, there was harmless error, which did not substantially affect defendants' rights.

## III.

Defendants claim prosecutorial misconduct during closing and rebuttal arguments deprived them of due process. Here, we believe defendants' failure to raise these claims at trial or on direct appeal is a procedural bar to a § 2255 motion.

Defendants contend the prosecutor's remarks in his closing and rebuttal arguments were "inflammatory and misleading" and argue the prosecutor "misrepresent[ed] and wrongly capitaliz[ed] upon a single brief statement of Mr. Oelsner during his testimony."[5] In his testimony, Oelsner referred to his employees as "skinny Filipinos." Emphasizing Oelsner's disregard for his employees, the prosecutor referred to this testimony four times during his closing and rebuttal arguments, using the phrase "skinny little Filipinos."[6] Defendants' trial counsel never objected to the prosecutor's characterizations. Instead, defendants' counsel chose to note in closing argument that the prosecutor's comments were "a very unnecessary appeal to a baser element and to a prejudice that doesn't have any place in this case."

In contrast to the visa fraud claim, the government properly raised an affirmative defense at the first opportunity, in its initial response to the § 2255 motion. The

---

[5]Overall, defendants asserted forty-three different instances of prosecutorial misconduct.

[6]In rebuttal, the prosecutor also asserted that Oelsner "rented his Filipino laborers by the pound."

government noted Oelsner "did not raise [the prosecutorial misconduct] claim on direct review and has therefore committed a procedural default." The government properly asserted procedural default.

A procedural default will bar review under § 2255 unless a defendant can establish cause for the waiver of procedural default and can show "actual prejudice" resulting from the alleged violation. *Reed v. Farley*, 512 U.S. 339, 354 (1994) (quoting *Wainwright v. Sykes*, 443 U.S. 72, 84 (1977)). Oelsner's trial counsel testified he made a strategic decision to respond to the prosecutor's statements in his own closing rather than draw the jury's attention by objecting. This was reasonable, especially since the prosecutor's statements substantially repeated Oelsner's own testimony. In any event, we see no prejudice. Oelsner's claim of prosecutorial misconduct is procedurally barred.[7]

## IV.

Defendants claim ineffective assistance of counsel at trial and sentencing, and on direct appeal. We find these claims lack merit.

---

[7]Even if this claim was not procedurally barred, the evidence is insufficient for Oelsner to meet his "heavy burden" to prove prosecutorial misconduct. *See United States v. Locascio*, 6 F.3d 924, 945 (2d Cir. 1993). This court has given prosecutors "considerable latitude" in laying out the evidence and suggesting to a jury that they may draw permissible inferences from the evidence. *E.g.*, *United States v. Green*, 25 F.3d 206, 210 (3d Cir. 1994); *United States v. Werme*, 939 F.2d 108, 117 (3d Cir. 1991). Here, Oelsner created his own problem when he described his employees as "skinny Filipinos" during his testimony. We see no appreciable difference between skinny Filipinos and skinny little Filipinos.

12

The Supreme Court has developed a two-part test for ineffective counsel claims. A defendant must prove: (1) counsel's performance was deficient; and (2) the deficient performance prejudiced the defense. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see also United States v. Robertson*, 194 F.3d 408, 418-19 (3d Cir. 1999). There is "a strong presumption that counsel's conduct f[ell] within the wide range of reasonable professional assistance." *Strickland*, 466 U.S. at 689.

Defendants rest their ineffective assistance claim on the belief that trial counsel Moore should have hired an expert to counteract the government's expert on sentencing and to establish their inability to pay fines or restitution. At the § 2255 hearing, defendants offered the testimony of Alan Chaset, a post-conviction sentencing expert. Chaset contended a reasonable attorney would have hired an expert to counter the government's expert.

But trial counsel Moore convincingly testified at the § 2255 hearing that he did not hire an expert because of Oelsner's views. Oelsner's self-admitted primary concern was jail time, and Moore focused his resources on challenging the pre-sentencing recommendations for incarceration. Although the trial court suggested the government and the defense split the costs of a single expert to determine defendants' ability to pay fines or restitution, Moore testified that Oelsner opposed making even a partial contribution and made clear his fear that further financial scrutiny might incriminate him more deeply. The government decided to pay for an expert itself. Moore's inability to convince Oelsner to

13

hire his own expert was hardly unreasonable, especially in light of Oelsner's paramount financial, privacy, and self-incrimination concerns.

Moore provided effective assistance during trial and sentencing, and on direct appeal.[8] At sentencing, Moore successfully challenged the Pre-Sentence Investigation Report's recommendation of 63-78 months incarceration and secured a reduction in Oelsner's jail time to 37 months. Also, Moore successfully moved for dismissal of a Virgin Islands territorial criminal action against Oelsner. Even defendants' expert at the § 2255 hearing acknowledged Moore's success in reducing Oelsner's jail time.

Moore's conduct was hardly deficient. Thus, we need not reach the question of prejudice. *Id.* at 687, 694. Defendants received effective assistance of counsel.

---

[8]Defendants also claim ineffective assistance at trial and on direct appeal. Specifically, defendants cite Moore's failure to call an immigration expert at trial and his failure to object to the prosecutor's allegedly inflammatory remarks. The reasonableness of each of these claims is addressed in Parts II and III, *supra*.

## V.

At sentencing, the government introduced a Price Waterhouse expert report assessing defendants' ability to pay a fine. As noted, the District Court subsequently imposed a fine in excess of $4 million and ordered more than $1 million in restitution. Defendants claim the Price Waterhouse report contained materially inaccurate information on which the District Court erroneously relied.[9]

At the § 2255 hearing, defendants retained an accountant expert, Stanley Foodman, who testified to some purported inconsistencies within the Price Waterhouse report. On cross-examination, however, Foodman admitted he had not looked at evidence beyond the Price Waterhouse report itself. During the § 2255 hearing, the government effectively used other trial testimony – of which Foodman was unaware – to clarify the purported inconsistencies. Oelsner now attempts to argue the Price Waterhouse report is tainted because its author did government contract work as well. But Oelsner makes no showing of prejudice.

At sentencing, the District Court took into account the Price Waterhouse report and also looked to defendants' vessel assets, insurance proceeds, salary, and other income. We see no error.

---

[9]According to defendants, the District Court refused to consider this claim in their § 2255 motion, which resulted in a denial of due process. The District Court interpreted this claim as arguing the fines were excessive, an issue it dealt with at trial and on appeal. The District Court did address the Price Waterhouse report in the portion of its decision reviewing the ineffective assistance of counsel claims. The record is sufficiently clear to determine the Price Waterhouse report is not materially erroneous.

## VI.

For the foregoing reasons, we will affirm the judgment of the District Court.

TO THE CLERK:

Please file the foregoing opinion.


                                            /s/Anthony J. Scirica
                                            Circuit Judge


DATED: March 27, 2003