**In re THOMSON McKINNON SECURI-TIES INC. and Thomson McKinnon Inc., Debtors.**

**Bankruptcy Nos. 90 B 10914, 90 B 11805.**

United States Bankruptcy Court, S.D. New York.

June 17, 1992.

Saiber Schlesinger Satz & Goldstein, Newark, N.J., for debtor Thomson McKinnon Securities Inc.

Podvey, Sachs, Meanor & Catenacci, Newark, N.J., for John J. Brunetti.

## DECISION ON OBJECTION TO CLAIM OF JOHN J. BRUNETTI

HOWARD SCHWARTZBERG, Bankruptcy Judge.

The claim of John J. Brunetti ("Brunetti") to hold the debtor responsible for the $2.2 million premium and related expenses which he paid to acquire the second largest block of Monmouth Park Race Track ("Monmouth") stock depends upon tying together a series of unconnected events in a total scenario. This is somewhat akin to the fable explaining that without a nail, the horseshoe was lost, without the horseshoe the horse was lost, without the horse, the, rider was lost, without the rider, the battle and the kingdom were lost. In the instant case, no horse was lost, but the racetrack was acquired only after the payment of a settlement premium of $2.2 million and an expenditure for costs and legal fees.

Brunetti paid a settlement premium of $2.2 million to the seller of the second largest block of stock of Monmouth because the seller attempted to back out of a private contract with Brunetti for the sale of the stock on the ground that Brunetti's ownership of the stock had not yet been approved by the New Jersey State Racing Commission (the "Commission"). The Commission's approval of Brunetti's ownership was delayed because of the need for a police investigation of any new race track stock owner who had not previously been approved by the Commission. The approval ultimately came through after Brunetti commenced an action against the seller for specific performance, in which the Governor of New Jersey, the New Jersey Race Track Commissioner and other state officials were joined as defendants.

The seller gave as a reason for rescinding the contract that the Commission had not yet approved Brunetti's proposed purchase. Brunetti had inserted a clause in the contract which conditioned his obligation to purchase the stock on such purchase first being approved by the Commission. Brunetti did not want to be obligated to purchase the stock only to learn later that the purchase was not approved by the Commission. The seller used the Commission's delay in approving Brunetti as an excuse to rescind the contract. Whether or not such excuse was justifiable was never fully pursued on appeal because Brunetti agreed to pay a $2.2 million settlement premium to the seller to acquire the stock.

Brunetti now seeks to hold the debtor, TMSI, responsible for the $2.2 million settlement premium, litigation expenses and interest charges he incurred because in prior years he had purchased smaller blocks of Monmouth stock through the debtor, as his broker, which were held by the debtor in confidence, as requested by Brunetti, with the result that his purchases of Monmouth stock were never submitted to the Commission for approval. Brunetti alleges that he assumed that the Commission had approved those previous Monmouth stock purchases through the debtor, as his broker, so that when he entered into the subsequent private transaction for the purchase of the second largest block of Monmouth stock, in which the debtor played no part, the Commission's approval would be obtained routinely, without further delay necessitated by a police investigation. Accordingly, Brunetti attributes the delay in obtaining the Commission's approval of his

private purchase of Monmouth stock and his having to pay a $2.2 million settlement premium before the Commission's approval ultimately came through, as having been caused by the fact that he had not been approved by the Commission when the debtor purchased his previous small blocks of Monmouth stock in street name, and without the Commission's approval of Brunetti, as the beneficial owner.

The debtor argues that it is not responsible for whatever happened in the course of Brunetti's subsequent private purchase of Monmouth stock, in which the debtor was not involved, for the following reasons:

1. As a broker, the debtor was not obligated to process Brunetti's application for Commission approval of his previous stock purchases which were held in street name.

2. The delayed approval was caused by Brunetti's attorney, who first wrongly applied directly to the Commission for approval and then delayed in correctly submitting the application to the stock transfer agent.

3. The New Jersey Attorney General unexpectedly intervened and requested a more intensive investigation of Brunetti because the proposed purchase involved the second largest block of Monmouth stock. The New Jersey Attorney General's intervention, which was unprecedented, caused further delay before Brunetti could be approved.

4. The seller's excuse for rescinding his private deal with Brunetti, which did not involve the debtor at all, was based on the clause which Brunetti inserted in the contract that conditioned his obligation on his being approved by the Commission for the purchase of Monmouth stock from the seller, Evans. Had the clause requiring Commission approval not been inserted by Brunetti as a condition, the seller would have had no excuse to rescind.

5. Regardless of whether or not the debtor had an obligation to process Brunetti's earlier purchases of Monmouth stock for the Commission's approval, each purchaser of Monmouth stock was required by law to file a separate application for Commission approval for each separate purchase. Therefore, any prior failure to obtain Commission approval with respect to Brunetti's previous Monmouth stock purchases did not excuse the need for the submission of an application to the Commission for its approval of Brunetti's subsequent purchase of the Monmouth stock from the private seller. Because Brunetti was ultimately approved by the Commission, Brunetti would not have suffered any loss had he not imposed a clause in his private contract with the seller which gave the seller an opportunity to attempt to back out of the contract due to the delay in the Commission's approval of the transaction.

6. Brunetti caused his own loss by first delaying the sending of his application to the appropriate authority and then by voluntarily paying a $2.2 million settlement premium to the seller without further appealing the judicial determination as to whether or not the seller was justified in rescinding the contract.

7. Brunetti's loss was not proximately caused by any action or inaction on the debtor's part with respect to Brunetti's previous purchases of Monmouth stock through the debtor, as his broker.

## FINDINGS OF FACT

1. On March 28, 1990, the debtor, TMSI, filed with this court its petition for reorganizational relief under Chapter 11 of the Bankruptcy Code and continued in business as a debtor in possession in accordance with 11 U.S.C. §§ 1107 and 1108.

2. Brunetti filed a claim in this case on behalf of himself and Elberon Investment Corporation ("Elberon")[1] for over $2.2 million. The debtor objects to this proof of claim and has moved to expunge it. Pursuant to this court's Order Authorizing Estimation of Claims and Approving Estimation Procedures, entered February 11, 1991, a hearing on the debtor's objection

1. Elberon is a New Jersey corporation whose shares are held by Hialeah Park, Inc., a Florida corporation, whose shares in turn are owned by Hialeah, Inc., a Florida corporation, all of whose shares are owned by John J. Brunetti and his sons.

was held on June 9, 1992 and continued on June 11, 1992.

3. This claim is based on a complaint filed by Brunetti in an action captioned *Brunetti v. Thomson McKinnon Securities Inc.*, Civil Action No. 87–2862 (JCL) (D.N.J.1987), which was stayed pursuant to 11 U.S.C. § 362 upon TMSI's filing a bankruptcy petition with this court.

4. In the Fall of 1977, Brunetti decided to purchase shares of stock in Monmouth Park and engaged Ralph E. Primavera, a broker at the TMSI office in Deal, New Jersey. On November 14, 1977, TMSI and Brunetti entered into TMSI's standard form Customer Agreement. *See* Trial Exhibit J. The Customer Agreement does not address the purchase of Monmouth Park stock and no other written agreement was executed by the parties.

5. TMSI was a "market maker" in Monmouth stock. Specifically, TMSI was authorized and regulated by state and federal authorities in connection with purchasing such stock for its house account.

6. Brunetti directed TMSI to purchase stock in Monmouth Park on his behalf. Brunetti testified that his only instruction to TMSI regarding the purchase of Monmouth stock was "hold" the stock and keep it "confidential." TMSI claims that Brunetti verbally instructed TMSI to "hold" the Monmouth stock which TMSI acquired for him in "street name" and to keep confidential Brunetti's acquisition of the stock. TMSI was not purchasing Brunetti's Monmouth stock as market maker, but as Brunetti's broker.

7. From November, 1977 to March, 1982, TMSI purchased for Brunetti 8,937 shares of Monmouth stock in 28 separate transactions. TMSI held all of the stock in Monmouth that it purchased for Brunetti in TMSI's own name. Trial Exhibit N.

8. At the time of these stock purchases, the Commission approved each separate transfer of stock in a race track and required an Application for Transfer of Ownership to be completed by the transferee with every purchase.[2] The application re-

quired the transferee to disclose the name of the proposed owner of the stock to be transferred. Trial Exhibit 1. If the ownership was to be held by a nominee for the benefit of another party, the application required that the beneficial owner be named and background information be supplied. The application also required that both the owner and beneficial owner sign an affidavit stating that they had not violated any provisions of the racing laws of New Jersey and had not been convicted of a crime of moral turpitude.

9. To file an application with the Commission, a transferee had to submit the application to the appropriate transfer agent, which forwarded it to the Commission. The Commission then transmitted the form to the State Police for a three-way investigation. The Deputy Director of the Commission, Harold Handel, testified that a three-way investigation took between one and three months and was conducted for each transaction.

10. Handel also testified that the Commission did not require a three-way check when it approved certain subsequent purchases of stock by the same purchaser. Neither the applicable statute nor the regulations require the Commission to conduct a police investigation for any transfer of stock.

11. It was the routine custom of the Commission not to require a three-way police investigation if a transferee had been previously approved and was currently an approved owner of the particular racetrack stock. If an individual subsequent to his initial purchase, again purchased Monmouth stock, that person's name would not be sent for an additional three-way check, but rather, the application of that person for transfer of ownership of the additional shares would be submitted for approval without the necessity of an additional three-way check.

12. Brunetti never instructed TMSI to secure his approval as a Monmouth shareholder by the Commission, nor did TMSI advise Brunetti that such approval was nec-

---

**2.** The Commission has amended its rules governing such transfers since 1982.

essary. TMSI never submitted Brunetti's name to the transfer agent as the owner or beneficial owner of the stock which TMSI purchased for him. On each Application for Transfer of Ownership, TMSI listed itself as the owner of the transferred shares and on several application forms TMSI either left blank or replied "no" to the question regarding beneficial ownership. Therefore, TMSI failed to answer the application truthfully, in violation of applicable New Jersey law.

13. Between November of 1977 and April of 1982, Brunetti met the statutory requirement for ownership of Monmouth stock in that he had not ever been convicted of a crime of moral turpitude nor had he ever had any racing license permit denied.

14. On April 13, 1982, Brunetti entered into an Agreement for Sale of Stock (the "Evans Agreement") with David O. Evans, Interstate Development Co., Inc. and others (collectively "Evans") to purchase 127,-112 shares of Monmouth stock at $17.50 per share. The Evans stock constituted approximately 18% of the total outstanding shares of Monmouth stock and was the second largest block of Monmouth stock. *See* Trial Exhibit L.

15. The Evans Agreement had as a condition precedent to closing the transaction, that Brunetti obtain the Commission's approval of his ownership of the Monmouth stock by September 9, 1982. This provision was placed in the Evans Agreement at Brunetti's insistence to avoid placing Brunetti in the situation where he would have to pay for the stock and then be unable to obtain the requisite approval. *Id.* at ¶ 5. The Evans Agreement provided that if Brunetti did not receive timely approval, Evans had the option to extend the closing date for a stated period or to rescind the transaction on ten days notice. If Evans rescinded, a deposit Brunetti had given Evans would be returned and the Evans Agreement would be deemed null and void with no further liability to either party. Accordingly, Brunetti knew as early as April of 1982 that he needed Commission approval of the transfer of Monmouth stock from Evans.

16. Brunetti did not advise TMSI of the negotiation or acquisition of the Evans stock, nor did TMSI earn a commission in connection with the Evans transaction.

17. Under the Evans Agreement, Brunetti agreed not to submit his application for approval with the Commission until May 29, 1982. This date was chosen as an accommodation to the sellers so that they could be reelected as directors of Monmouth before the transfer was filed. However, on May 27, 1982, Brunetti's attorney, Murray A. Laiks ("Laiks"), mistakenly submitted the application for approval directly to the Commission rather than to Monmouth's stock transfer agent, the Commercial Trust Company of New Jersey. *See* Trial Exhibit 2.

18. By letter dated June 7, 1982, the Commission's Deputy Director advised Laik's of his error. Laiks did not submit Brunetti's application for approval to the transfer agent until one month later.

19. On July 29, 1982, the transfer agent forwarded Brunetti's application for approval to the Commission, after the Commission's monthly meeting for July. *See* Trial Exhibit 5. Consequently, Brunetti's application for approval did not come before the Commission until its August 30, 1982 meeting. *See* Trial Exhibit 6, at ¶ 11. On that date and pursuant to its general procedure, the Commission forwarded Brunetti's application to the New Jersey State Police for an investigation of Brunetti. *Id.* at ¶ 12.

20. Brunetti's application for transfer of the Evans stock was formally submitted to the Commission for approval at its public meeting on August 30, 1982. Brunetti argues that had the Commission previously ordered and received a three-way check of Brunetti in connection with purchases on Monmouth stock made through TMSI, the Commission would have approved this subsequent purchase of stock from Evans at its August 30, 1982 meeting and Brunetti would have closed with Evans on September 9, 1982.

21. On September 2, 1982, one week prior to the closing date of the Evans Agreement, Laiks advised the Commission

of the closing date for the first time. *See* Trial Exhibit 6, at ¶ 14.

22. On September 7, 1982, the State Police orally reported to the Commission that its investigation of Brunetti had uncovered no derogatory information. Accordingly, to enable Brunetti to close the purchase from Evans, the Commission scheduled a special meeting for September 13, 1982 to approve Brunetti's application.

23. However, on September 9, 1982, the Office of the Attorney General for the State of New Jersey intervened and directed the Commission to take no action on Brunetti's application pending further review by the Police and the Attorney General's office. The Attorney General, Irwin I. Kimmelman, advised the Commission that due to the number of shares involved in the Evans purchase and Brunetti's activities in Florida, a three-way check was inadequate and instead, a four-way check was necessary.[3] The Attorney General's intervention in a stock transfer application was unprecedented as was the directive that a four-way background investigation be conducted of a stock transferee.

24. The Attorney General's intervention caused the cancellation of the September 13, 1982 special meeting of the Commission pending the receipt of the results of the four-way investigation.

25. Although Brunetti appeared at the scheduled closing for the purchase of the Evans stock on September 9, 1982 and tendered payment, Evans refused to close and exercised his contractual option to rescind the transaction.

26. On October 18, 1982, the Commission received the results of the four-way background investigation and approved Brunetti's application for the purchase of the Evans stock at its October 28, 1982 meeting. The Commission approved Brunetti's ownership of the Monmouth stock that TMSI had purchased for him in November of 1982 when TMSI gave Brunetti his stock certificates.

27. Brunetti sued Evans for specific performance of the stock purchase agreement, as well as the Commission, Governor, Attorney General and other public officials, in New Jersey state court. TMSI was not a party to that lawsuit.

28. In 1985, while Brunetti was prosecuting an appeal before the New Jersey Supreme Court, the New Jersey Sports and Exposition Authority acquired Monmouth Park Racetrack and agreed to purchase its outstanding stock for $58 per share. Brunetti settled the Evans lawsuit. Pursuant to the settlement, Brunetti paid Evans a premium, or an amount over the contractual amount of $17.50 per share, equal to approximately twice the original purchase price or $2.2 million.

29. Thereafter, Brunetti sued TMSI in federal district court in New Jersey to recover this premium paid to Evans in settlement of the lawsuit. This lawsuit forms the basis for the damages Brunetti now seeks and the claim that he has filed in the instant bankruptcy case.

30. The chain of causation was broken by six intervening factors and events which make Brunetti's claim for the $2.2 million premium he paid and associated costs too remotely related to his earlier purchases of Monmouth stock through TMSI, as his broker.

(a) The subsequent private contract with Evans for the purchase of 127,112 shares of Monmouth stock did not involve TMSI and required separate approval from the Commission, which was ultimately obtained.

(b) The applicant for approval of the 127,112 shares of Monmouth stock purchased from Evans, was not Brunetti, but was his assignee, Elberon Investment Corporation, whose shares are owned by Hialeah Park, Inc., whose shares are in turn owned by Hialeah, Inc., all of whose shares are owned by Brunetti and his sons.

---

3. A four-way background investigation is a comprehensive investigation including an applicant's criminal and financial background and includes interviews and reference checks. In addition, information is obtained from other states as well as federal authorities. *See* New Jersey Racing Commission Rule 13:70–4.9.

(c) Brunetti imposed a time factor condition in the contract with Evans that the Commission's approval of Brunetti as an owner of Monmouth stock had to be obtained by September 9, 1982, otherwise either party could rescind the contract.

(d) Brunetti's attorney caused a delay in the approval process when he wrongly submitted an application for Brunetti's approval directly to the Commission, rather than to the stock transfer agent, and then delayed for one month resubmitting the application to the stock transfer agent.

(e) The New Jersey Attorney General intervened and caused further delay because he wanted a more intensive investigation because Brunetti proposed to purchase the second largest block of Monmouth stock.

(f) Brunetti chose to settle with Evans and paid a premium of $2.2 million to acquire the Monmouth stock after Evans used the delay in Brunetti's approval by the Commission as an excuse for rescinding the contract. Thus, there was never any final judicial appeal to determine that Evans was justified in rescinding the contract, or that Brunetti was not entitled to acquire the Monmouth stock from Evans at the purchase price, without having to pay a $2.2 million premium in settlement of the litigation.

## DISCUSSION

In 1982, New Jersey law provided that "no person shall in any manner become the owner or holder, directly or indirectly of any shares of stock" of a corporation which has a permit to hold horse races without first obtaining the Commission's approval.

**4.** Between November 1977 and September 1982, *N.J.S.A.* 5:5–34.1 provided in pertinent part that:

> Whenever any association or corporation has been or shall be granted a permit to hold a horse race meeting, no person shall in any manner become the owner or holder, directly or indirectly, of any shares of stock or certificates or other evidence of ownership of any interest in such association or corporation without first having obtained the approval of the commission therefore; ... Whenever the commission shall give to any person its approval to own or hold the shares of stock or certificates of other evidence of ownership of

N.J.S.A. 5:5–34.1 [4] The statute was amended effective July 7, 1983 to limit its application to transfers to a person whose interest would equal 5% or more in the licensee. The statute further provided that the Commission could revoke the racing permit of any corporation which registered on its books shares of stock in the name of someone who had not obtained the Commission's prior approval of the transfer. Under the statute, the Commission was to deny approval to any person convicted of a crime of moral turpitude or who had violated the New Jersey racing laws or any rule or regulation of the Commission, or who had been denied a license or permit by the Commission.

Pursuant to its enabling statute, N.J.S.A. 5:5–34.1, the Commission promulgated and enforced the following regulations which required all applicants for ownership of racetrack stock to be approved by the Commission:

N.J.A.C. 13:70–3.5 provided:

> No person shall in any manner become the owner or holder, directly or indirectly, of any shares of stock or certificates or other evidence of ownership of any interest in any association or corporation which has been or shall be granted a permit to hold or conduct a horse race meeting without first obtaining the approval of the New Jersey Racing Commission pursuant to these rules and regulations.

N.J.A.C. 13:70–3.6 provided:

> Such approval must be obtained by *all persons whether or not they have previously or presently possessed such own-*

> any interest in any such association or corporation, it shall, by registered mail, notify the secretary of such association or corporation of such approval; provided, however, that under no circumstances shall the commission give such approval to any person who has been convicted of a crime involving moral turpitude, or had violated any of the provisions of the racing laws of the State of New Jersey or any rule or regulation of the commission, or had at any time been denied a license or permit of any kind by the commission.
> *Id.*

*ership*, or intend to own such interest for the first time.

*Id.* (emphasis added). Thus, the Commission required that approvals for stock transfer be obtained by all stock transferees, including those persons who had previously received Commission approval to own stock in New Jersey racetracks.

▆▆ Before this court determines the merits of the underlying action, it must first decide whether to apply the substantive law of New York or New Jersey. Because New York is the forum state, this court must rely upon New York's choice of law rules to determine which state's substantive law applies. *Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496–97, 61 S.Ct. 1020, 1021–22, 85 L.Ed. 1477 (1941); *Machleder v. Diaz*, 801 F.2d 46, 51 (2d Cir.1986), *cert. denied*, 479 U.S. 1088, 107 S.Ct. 1294, 94 L.Ed.2d 150 (1987). Under New York choice of law principles, this court must apply the substantive tort or contract law of the state having the most significant relationship with the occurrence and with the parties. *Babcock v. Jackson*, 12 N.Y.2d 473, 482, 240 N.Y.S.2d 743, 191 N.E.2d 279 (1963). *See American Protein Corp. v. AB Volvo*, 844 F.2d 56, 62–63 (2d Cir.) (New York substantive law applied because acts constituting the alleged tort occurred in New York and New York corporation was implicated), *cert. denied*, 488 U.S. 852, 109 S.Ct. 136, 102 L.Ed.2d 109 (1988).

▆▆ In the present case, the acts constituting the alleged tort occurred in New Jersey, TMSI' branch office in question was located in New Jersey, and the plaintiff, Brunetti, created a New Jersey corporation, Elberon, through which the stock in Monmouth, a New Jersey race track, was purchased. Consequently, this court must apply the substantive tort and contract law of New Jersey in resolving TMSI's objection to Brunetti's claim.

▆▆ Brunetti contends that his payment of the $2.2 million settlement premium to Evans was proximately caused by TMSI's failure to obtain the Commission's approval of his purchases of Monmouth stock in previous years through TMSI, as his bro-

ker. There is no dispute that Brunetti requested TMSI to purchase Monmouth stock for him in the years 1977 through 1982 and that TMSI was instructed by Brunetti to "hold" the shares for him and to keep his purchases "confidential" because he ultimately hoped to be elected to Monmouth's board of directors. Although Brunetti testified that he never told TMSI to purchase the shares in street name, TMSI interpreted the directions to "hold" and keep such purchases "confidential" to mean that the shares should be purchased and held by TMSI in street name, rather than in Brunetti's name. Had the shares been purchased during the years 1977 through 1982 in Brunetti's name, he would have had to fill out an application with personal background information for approval by the Commission before the shares could be transferred to him. Hence, Brunetti would have learned, if he already did not know, that Commission approval was a prerequisite to owning stock in a New Jersey race track.

Accordingly, Brunetti contends that TMSI breached its fiduciary duty to him as a stockbroker to execute his orders in full by failing to do what was necessary to process Brunetti's application for Commission approval of his Monmouth stock purchased in the years from 1977 through 1982. Had Brunetti obtained such previous Commission approval, he reasons that his subsequent private contract to purchase the Evans stock in 1982 would have been approved without delay, so that Evans would have had no excuse for rescinding the contract and Brunetti would not have had to pay a $2.2 million premium to purchase the Monmouth stock which Evans contracted to sell to Brunetti by September 9, 1982.

▆▆ It is well-settled that under applicable law both in New Jersey and generally elsewhere, a broker has a duty to act with good faith toward the principal and not act in any manner inconsistent with the agency or trust relationship. *McAdam v. Dean Witter Reynolds, Inc.*, 896 F.2d 750, 767 (3d Cir.1990); *Oscar Mayer Corp. v. Mincing Trading Corp.*, 744 F.Supp. 79, 82

(D.N.J.1990); *Rothman Realty Corp. v. Bereck*, 73 N.J. 590, 599, 376 A.2d 902 (1977); *General Films, Inc. v. Sanco Gen. Mfg. Corp.*, 153 N.J.Super. 369, 372, 379 A.2d 1042 (App.Div.1977). If a stockbroker's conduct violates a rule of the stock exchange, a client who sustains damages as a result of such breach has a claim for breach of the stockbroker's fiduciary duty. *See White v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 90 N.J.Super. 565, 570, 218 A.2d 655 (Law Div.1966).

In the instant case, even if TMSI had the right to purchase the Monmouth shares for Brunetti in street name, rather than in Brunetti's name, because it believed it was following Brunetti's instructions to "hold" the shares and keep his purchases "confidential," it does not follow that TMSI should have failed to disclose on the application for the stock transfer agent that no other party had a beneficial interest in the shares. Had TMSI disclosed Brunetti's beneficial interest on the application, he would have been alerted that his approval by the Commission was required. He would also have had actual knowledge as to whether or not the Commission approved his ownership of the Monmouth stock which TMSI purchased for him during the period from 1977 through 1982. TMSI's failure to list Brunetti as a beneficial owner during the years from 1977 through 1982, when it purchased the Monmouth shares in street name, violated the Commission's requirement, as reflected in its application forms, requiring the disclosure by the transferee of the name of the proposed beneficial owner and the owner's personal background information.

■ Generally, where a customer gives an order to a broker to be executed through a particular board of trade or exchange, the customer is entitled to expect that the broker will conform to the rules and customs that prevail there. *White*, 90 N.J.Super. at 570, 218 A.2d 655. The issue to be resolved, however, is whether TMSI's breach of its duty to list Brunetti as beneficial owner of the purchased Monmouth stock in 1977 through 1982, because of his instruction to "hold" the shares and treat

the purchases as "confidential," was the proximate cause of his having to pay a $2.2 settlement premium in order to acquire the Monmouth stock from Evans.

■ TMSI argues that Brunetti's approval of the Evans stock would have been delayed by the Commission even if his beneficial ownership had been disclosed as to the Monmouth shares purchased through TMSI, and even if his ownership of those shares had previously been approved by the Commission. Manifestly, an act or omission is not regarded as a cause of an event if the particular event would have occurred without it. Prosser, Law of Torts, § 41, at 238 (4th ed. 1971). Brunetti must prove that TMSI's breach of a duty was a proximate cause of his loss. *Kulas v. Public Service Electric and Gas Co.*, 41 N.J. 311, 196 A.2d 769 (1964). If the result would have happened whether or not the defendant failed to perform its duty, the failure to perform the duty did not cause the result. Beale, *The Proximate Consequences of an Act*, 33 Harv.L.Rev. 632, 637–38 (1920).

Brunetti paid a $2.2 million settlement premium to Evans because Evans relied upon a condition in their contract which required Commission approval of Brunetti's ownership of the Monmouth stock by September 9, 1991. Had Brunetti not imposed this condition in the contract, Evans would have had no justification for rescinding and Brunetti would not have been prompted to settle the dispute by paying a $2.2 million premium for Evans' stock interest in Monmouth. Additionally, had Brunetti's attorney correctly filed Brunetti's approval application with the stock transfer agent rather than with the Commission and had he not delayed for one month in correcting his error by then resubmitting the misdirected application to the stock transfer agent, the Commission's approval might have been obtained in timely fashion. Additionally, Brunetti chose to settle with Evans by paying a $2.2 million premium to acquire the Monmouth stock without pursuing a further appeal of the state court ruling that Brunetti did not have the right to waive the condition in his

contract which called for Commission approval by September 9, 1982. TMSI was not a party to Brunetti's litigation with Evans and was not given prior notice that Brunetti proposed to pay a $2.2 million premium to acquire the Monmouth stock from Evans.

There were too many intervening factors between TMSI's failure to name Brunetti as the beneficial owner of the Monmouth shares which it purchased for him in 1977 through 1982 and Brunetti's payment to Evans of a $2.2 million settlement premium after Evans' attempt to back out of its contract with Brunetti because Brunetti failed to comply with the approval condition which he imposed in the contract.

> [T]he connection between the defendants' negligence and the claimants' damages is too tenuous and remote to permit recovery.

*Petition of Kinsman Transit Co.,* 388 F.2d 821, 825 (2d Cir.1968).

■ TMSI may be responsible for any damages incurred by Brunetti as to the Monmouth stock which TMSI purchased for him resulting from TMSI's failure to list him as the beneficial owner. TMSI cannot be held responsible for the fact that an investigation was required before the Commission would approve Brunetti's private purchase of the Evans stock, or that Brunetti paid a $2.2 million settlement premium to Evans because Evans held Brunetti to the self-imposed condition that Commission approval was required before Brunetti was obligated to purchase the Monmouth stock from Evans. One who breaches a duty owed to another is not responsible for damages resulting from intervening causes that are not reasonably foreseeable. *Charpentier v. Godsil,* 937 F.2d 859, 868 (3d Cir.1991) (citing New Jersey authorities).

### CONCLUSIONS OF LAW

1. This court has jurisdiction of the subject matter of this proceeding under 28 U.S.C. §§ 1334 and 157(a). This is a core proceeding in accordance with 28 U.S.C. § 157(b)(2)(B).

2. TMSI's failure to list Brunetti as a beneficial owner when it filed stock transfer applications with respect to his purchases in Monmouth stock from 1977 through 1982, constituted a violation of the Commission's stock transfer requirements with respect to New Jersey race track stock.

3. TMSI's violation of the Commission's stock transfer requirements with respect to Brunetti's previous purchases of Monmouth stock were not the proximate cause of Brunetti's $2.2 million settlement premium which he paid with respect to the subsequent private purchase of Monmouth stock from Evans.

4. Brunetti has not sustained his burden of proof by a preponderance of the evidence as to his claim against TMSI. Accordingly, TMSI's objection to Brunetti's claim is sustained and it shall be expunged. SETTLE order on notice.